IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROSEMARIE KAISER,            )
                                      )
               Plaintiff,        )
                                      )
           v.              )     Civil Action No. 04-1747
                                      )
JO ANNE B. BARNHART,     )
COMMISSIONER OF SOCIAL SECURITY,    )
                                      )
               Defendant.    )

<u>MEMORANDUM ORDER</u>

CONTI, District Judge

### *Introduction*

Pending before the court is an appeal from the final decision of the Commissioner of Social Security ("Commissioner" or "defendant") denying the claim of Rosemarie Kaiser ("plaintiff") for Supplemental Social Security ("SSI") under Title XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 1381, *et seq.* Plaintiff contends that the decision of the administrative law judge (the "ALJ") that she is not disabled, and therefore not entitled to benefits, should be reversed because the decision is not supported by substantial evidence and that an order awarding disability benefits be entered or the case should be remanded for the ALJ to consider properly all the evidence as presented. Defendant asserts that the decision of the ALJ is supported by substantial evidence. The parties filed cross-motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. The court will deny plaintiff's motion for summary judgment and will grant defendant's motion for summary judgment because the decision of the ALJ is supported by substantial evidence.

### *Procedural History*

Plaintiff filed the application at issue in this appeal on December 23, 2002 (R. at 85-87), asserting a disability since November 1, 2001 by reason of anxiety, depression and back pain. (R. at 85, 101.)  She was denied at the initial level (R. at 70) and then filed a request for a hearing.  (R. at 76.)  On November 20, 2003, a hearing was held before the ALJ.  (R. at 28-69.) Plaintiff appeared at the hearing and testified.  (R. at 33-64.)  Plaintiff was represented by an attorney at the hearing (R. at 30.)   A vocational expert ("VE") also testified.  (R. at 66-68.)  In a decision dated July 15, 2004, the ALJ determined that plaintiff was not disabled and, therefore, not entitled to benefits.  (R. at 16-22.)  Plaintiff timely requested a review of that determination and presented additional evidence to the Appeals Council.  By letter dated October  26, 2004, the Appeals Council denied the request for review.  (R. at 5-7.)  Plaintiff subsequently commenced the present action seeking judicial review.

### *Legal Standard*

The Congress of the United States provides for judicial review of the Commissioner's denial of a claimant's benefits.  42 U.S.C. § 405(g).  This court must determine whether there is substantial evidence which supports the findings of the Commissioner.  42 U.S.C. § 405(g). "Substantial evidence is 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate.'"  Ventura v. Shalala, 55 F. 3d 900, 901 (3d Cir. 1995)(quoting Richardson v. Perales, 402 U.S. 389 (1971)).  This deferential standard has been referred to as "less than a preponderance of evidence but more than a scintilla."  Burns v. Burnhart, 312 F. 3d 113, 118 (3d Cir. 2002).  This standard, however, does not permit the court

to substitute its own conclusions for that of the fact-finder.  Id.; Fargnoli v. Massonari, 247 F.3d 34, 38 (3d Cir. 2001)(reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless of whether the court would have differently decided the factual inquiry).

### Plaintiff's Background and Medical Evidence

#### a.  Plaintiff's background

Plaintiff was born on December 24, 1952, which meant that she was fifty years old at the time of the hearing before the ALJ.  ( R. at 33.)  She was single and lived in a duplex with her grandson's father.  (R. at 33.)  She was previously married but the marriage ended in divorce. (R. at 85.)  She did not know who paid the rent but it was clear she was not paying rent.  (R. at 39.)  She is a high school graduate and had one year's further education at Saint Benedicts Education Center.  (R. at 34.)  The last time plaintiff had a job was in 2001.  That job was driving cars and was part-time work.  (R. at 35.)  She also indicated prior work as a driver, waitress, and basket braider.  (R. at 102.)  She stopped working to go to Spokane, Washington to fight for her son's custody.  (R. at 36.)  Upon return she did lawn care during the summer until she physically was not able to work.  (R. at 36.)  She has an automobile.  (R. at 39.)

Plaintiff's only prescription medication at the time of the hearing was Celexa.  (R. at 24.) She took over-the-counter medications such as Aleve for pain.  Plaintiff testified that the Celexa was effective and that her crying spells were more moderate than in the past.  (R. at 44.)  While on the Celexa plaintiff testified that she has crying spells at least once or twice a day for approximately ten to twenty minutes.  (R. at 57.)  She had chronic pain in her neck and her hip

and right shoulder.  (R. at 44.)  She had taken prescription pain medicine in the past, probably in 1999.  (R. at 45.)  Occasionally she took hot showers at the advice of her chiropractor.  (R. at 45.)  She was treated at an emergency room in late 2002.  (R. at 46.)  Plaintiff stated it was for both physical and mental conditions.  (R. at 47.)  She was not kept in the hospital and was prescribed an antibiotic.  (R. at 48.)

In her daily activities plaintiff would lift a light load of laundry.  (R. at 48.)  Plaintiff testified she had difficulty lifting a gallon of milk and standing as well as sitting.  (R. at 49.)  She was able to walk across the street to the grocery store.  (R. at 50.)  Plaintiff testified that she has terrible headaches, (R. at 52), and that she would lie down and sleep during the day.  (R. at 52-53.)  She also testified that she had difficulty sleeping, (R. at 53), and that she no longer shops, goes to movies or shoots pool.  (R. at 60.)  She cannot crochet in the same manner that she did.  (R. at 60.)  She no longer runs or plays basketball or lifts weights.  (R. at 61.)  She watches her grandson.  (R. at 37.)

On plaintiff's application for SSI dated December 23, 2002, plaintiff asserted that her disability began on November 1, 2002.  ( R. at 85.)  In her disability report, plaintiff, however, claimed an alleged onset date of August 1, 2001, (R. at 95), and listed the following conditions which affected her ability to work: "depression, anxiety, low back pain."  (R. at 101.)   In her interview, plaintiff was noted as having difficulty concentrating.  (R. at 98.)

### b. *Medical records considered by the ALJ*

Plaintiff's medical treatment reflected that she saw 1) Dr. Te for depression; 2) Dr. Faust for her lower back; 3) Dr. Spaulding for her lower back (she "went to him once as he replaced Dr. Faust"); 4) Dr. Christi for adjustments to her neck; and 5) Dr. Zacherl whom she only saw

4

twice because she was not happy with her treatment.  (R. at 132.)  Included in plaintiff's medical records were records from Dr. George of Meadville Chiropractic (R. at 138-52.)  There were also records from Sharon Regional Health System, Behavioral Health Services.  (R. at 154-65.)

On October 29, 2002, a clinician reported plaintiff's global assessment of functioning ("GAF") was 58 and her problem was depression.  (R. at 162.)

On November 13, 2002, Dr. Susan Te reported that plaintiff was followed for depression and anxiety and that plaintiff "is seeking help by counseling and with medications."  (R. at 165.)  Dr. Te also noted plaintiff's back and arm numbness and planned to provide her "a one-year temporary disability."  (Id.)  On September 18, 2002, Dr. Te reported that plaintiff complained of depression, that her son was stolen by his father in 1999 has custody and she cannot see her son; that plaintiff believed that this has been her problem for the past fourteen years; and that plaintiff did not want to hurt herself.  The treatment planned was to have counseling and start Celexa.  (R. at 166.)  On December 16, 2002, Dr. Te reported that plaintiff was feeling much better and she was not as cheerful although she was tired.  (R. at 167.)  Dr. Te's assessment was depression and anxiety and the plan was to increase Celexa to 40 mg. once a day.  Id.  Dr. Te saw plaintiff on May 1, 2002 for sinusitis, and there was no note of depression or anxiety.  (R. at 168.)

On January 16, 2003, in a letter, Dr. Faust reported that plaintiff was seen on September 30, 2002, and the findings reflected "subluxation in the cervical, thoracic, lumbar spine and areas of muscular strain and spasms."  (R. at 171.)  He noted that plaintiff was being seen by a chiropractor with periods of improvement and also times of pain and discomfort.  (R. at 171.)

On February 27, 2003, plaintiff was seen by C. James Poolos, M.D., for a disability examination.  The impressions of Dr. Poolos were lumbosacral strain, rule out cervical myositis,

5

rule out cervical osteoarthritis, depression and "adhesive capsulitis of the right shoulder." (R. at 178.) On March 14, 2003, plaintiff had a clinical/psychological disability evaluation by Julie Uran, Ph.D., a psychologist. (R. at 181-84.) Dr. Uran diagnosed her with major depression, recurrent, with back and neck pain, headaches, head injury, significant stressors and noted a GAF score of 55 for plaintiff. Dr. Uran noted that plaintiff's prognosis would be "poor in terms of higher level functioning and personality integration" although she was capable of managing personal funds. (R. at 184.) Dr. Uran completed a check list noting that plaintiff was "OK" in most situations although she had no socialization, performs cleaning with pain and had to avoid strenuous "maintaining a residence." (R. at 185.) In making occupational adjustments, Dr. Uran noted that plaintiff had good ability to follow work rules and interact with supervisors, and a fair ability to relate to co-workers, deal with the public, use judgment, function independently and maintain attention/concentration. Dr. Uran, however, checked the box "poor/none" for plaintiff's ability to deal with work stresses. (R. at 187.)

On March 20, 2003 Dilip S. Kar, M.D., completed a form for plaintiff's residual functional capacity assessment-physical. (R. at 189-98.) It was noted that plaintiff could occasionally lift fifty pounds, frequently lift twenty-five pounds, could stand and/or walk about six hours in an eight-hour work day, could sit for the same period time, and had unlimited ability to push/pull. (R. at 190.) Dr. Kar noted no postural limitations. (R. at 191.) No manipulative limitations or visual limitations were noted. (R. at 192.) In addition, there were no communicative or environmental limitations noted. (R. at 193.) Dr. Kar acknowledged that there were other treating sources that had the different conclusions regarding plaintiff's limitations. (R. at 195.) Dr. Kar in an attachment to the residual functional capacity assessment

(R. at 197-98) noted that while plaintiff sees a chiropractor, plaintiff never had x-rays or an MRI or a referral to a specialist.  Dr. Kar also noted Dr. Poolos' consultative examination where there was some tenderness but plaintiff's lungs were clear and musculoskeletal pulses were normal. There was no joint swelling, although there was tenderness on the right thumb.  Her gait was normal, strength was 5/5 in all four extremities, impression being of a lumbosacral strain and adhesive capsulitis of the right shoulder.  Her range of motion was 90º for right and 150º for the left, and lumbar flexion was 90º.  (R. at 197.)  Dr. Kar found plaintiff's statements partially credible although there was no significant medical attention given to her back ache and the "[c]onsultative examination and physical findings were not significant."  (R. at 198.)

On May 1, 2003, Sharon Becker Tarter, Ph.D. performed a mental residual functional capacity assessment.  (R. at 199-201.)  In the assessment Dr. Tarter found no limitations in the markedly limited category.  (Id.)  Plaintiff's other limitations were found not significantly limited except for moderate limitations in the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to interact appropriately with the general public, the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, the ability to respond appropriately to changes in the work setting and the ability to set realistic goals or make plans independently of others.  (R. at 199-200.)  Dr. Tarter explained the finding that the claimant was partially credible by noting that plaintiff's "basic memory processes are intact."  Dr. Tarter found that the opinion by Dr. Uran was consistent with the residual functional capacity determined by Dr. Tarter.  (R. at 201.)  Dr. Uran's opinion was given great weight in the assessment by Dr. Tarter.  (Id.)  Dr. Tarter concluded: "The claimant is able to meet the basic mental demands of competitive work on a

sustained basis despite the limitations resulting from her impairment." (Id.) Dr. Tarter completed a check list of functional limitations and found only mild to moderate limitations. (R. at 212.)

The VE testified, with respect to plaintiff's prior work, that she had been a waitress from about April 2000 till August 2000 and in that job she would have had to be on her feet and engage in frequent bending and reaching and lift up to twenty pounds. (R. at 63.)  The VE classified that work as unskilled and light.  Id.  From April 1990 until October 1990 plaintiff cleaned offices and stairways.  Id.  In that job she was on her feet and engaged in frequent bending and kneeling and lifting up to 20 pounds.  Id.  That job was also classified as unskilled and light.  Id.  From June 1996 until August 1999 plaintiff was a basket braider.  Id.  The VE classified "that job as unskilled, with a medium exertional level."  (R. at 64.)

The ALJ posed the following hypothetical to the VE:

> I'd like you to consider an individual of the claimant's age, education, and work history, who's able to perform work at the light exertional level. That requires no more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling.  And, that consists of simple routine, repetitive tasks, with one or two step instructions performed in a low stress environment that I will define as work requiring few decisions.  And that requires no more than occasional contract [sic] with the public and coworkers.  And that does not require what I'll call, strict production requirements, meaning that the worker must achieve a certain prescribed number of unites [sic] of work in a given period.

(R. at 64-65.)  The VE responded that the hypothetical individual could engage in various jobs including laborer, plastic industry which is light work and also cleaner, light exertional level.  (R. at 65.) When asked if an individual with a rating of "poor or none for dealing with work stresses"

could be employed, the VE stated that that individual would not be capable of performing at the substantially gainful work activity level.  (R. at 68.)

At the hearing before the ALJ on November 20, 2003, plaintiff's attorney advised the ALJ that in November 2003 plaintiff had seen Dr. Zacherl, a chiropractor, and also Dr. Spaulding.  In addition, Dr. Te, plaintiff's primary care physician, and Dr. McConnell, a chiropractor, had some records that had not been submitted.  (R. 31-32, 55-56.)  The ALJ agreed to leave the record open for two weeks until December 4, 2003 in order for plaintiff to submit those records.

Records were also reported to be available from plaintiff's treatment at Sharon Regional Health in October 2002 and at the Mercer Behavioral Health Center.  (R. at 41.)  She also was treated at the Behavioral Health in Greenville.  (R. at 42.)  The ALJ left the record open to receive medical records from Sharon Regional Health, Mercer Behavioral Health Center, and Greenville Behavioral Health Center.  The date for the receipt of those records was the same as the date for the receipt of the other medical records, December 4, 2003.  (R. at 43.)

### c.  *Medical records submitted after the hearing before the ALJ*

Certain medical records were received after the hearing.  The records included reports from her family physician, Dr. Susante.  (R. at 216-19).  Those records were from December 5, 2003, and reflect that plaintiff has right wrist problems and numbness in fingers, but Dr. Susante found normal x-rays of the cervical spine and x-rays of the hand and felt this was "a carpal tunnel syndrome."  (R. at 216.)  Also records from Dr. William R. McWhirter were submitted.  The records were from a nerve conduction study dated December 12, 2003, and reflected conditions suggestive of right carpal tunnel syndrome.  (R. at 220.)   On September 5, 2003, Dr. Kevin J.

Leonard reported an impression of "[L]eft hand within normal limit.  No evidence of acute fracture or dislocation."  (R. at 224.)

There also was a report from Dr. Susan Te dated September 11, 2003 in which it was noted that plaintiff had been in an altercation and that there were no broken bones or dislocation. (R. at 231.)   She had numbness in her left fourth finger.  Id.  On September 4, 2003, Dr. Te noted that plaintiff had been in an altercation, there were no x-rays performed, and Dr. Te found that there was no severe swelling, although there was tenderness.  (R. at 232.)  On August 21, 2003, Dr. Te noted anxiety, depression, low back pain, and right hand pain.  (R. at 234.)  On June 23, 2003, Dr. Te noted an assessment of depression with sleep deprivation.  (R. at 238.)  Plaintiff reported that "her poor sleeping habit is an old problem."  Id.  On July 8, 2003, Dr. Te noted depression/anxiety, but that plaintiff's counseling was helping some and she had "[n]o thoughts of wanting to hurting herself or others."  (R. at 239.)

Chiropractic records were also included.  (R. at 244-51.)  Records from Sharon Regional Health System, Behavioral Health Services on November 25, 2002, reflected a fair progress.  (R. at 252.)  Plaintiff's master treatment plan from Sharon Regional Health System, Behavioral Health Services, dated November 25, 2002, reflected a GAF of 58 and that her medication was Celexa.  (R. at 254.)  On August 24, 2004, Richard A. Williams, a reading radiologist, read an MRI of plaintiff's spine (R. at 256-28) and noted:  "There is multilevel disc protrusion and degenerative change cervical spine.  This is most pronounced at C5-C6 with left paramedian disc or osteophyte exhibiting mild deformity upon left ventral cord.  Mild disc and osteophyte impinges upon ventral cord C4-C5."  (R. at 256.)   The MRI of plaintiff's lumbar spine reflected: "There is generalized disc protrusion L4-L5  disc with mild deformity upon thecal sac and

narrowing lateral recesses this level.  Otherwise, negative MRI study lumbar spine."  (R. at 257.)
With respect to her left knee, the impression from the MRI was: "There are findings consistent
with tear involving posterior horn medial meniscus extending to inferior articular surface.
Otherwise, negative MRI study left knee."  Id.

### Discussion

Under Title XVI of the SSA, a disability is defined as the inability "to engage in any
substantial gainful activity by reason of any medically determinable physical or mental
impairment which can be expected to result in death or which has lasted or can be expected to
last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).
Similarly, a person is unable to engage in substantial gainful activity when "his physical or
mental impairment or impairments are of such severity that he is not only unable to do his
previous work but cannot, considering his age, education, and work experience, engage in any
other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. §
1382c(a)(3)(B).

In order to make a disability determination under the SSA, a five-step sequential
evaluation must be applied.  20 C.F.R. §§ 404.1520, 416.920.  The evaluation consists of the
following stages: (1) whether the claimant is currently engaged in substantial gainful activity; (2)
if not, whether the claimant has a severe impairment; (3) if so, whether the claimant's severe
impairment meets or equals the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P,
app. 1; (4) if not, whether the claimant's impairment prevents him from performing his past
relevant work; and (5) if so, whether the claimant can perform any other work which exists in the

11

national economy in light of his age, education, work experience and residual functional

capacity.  20 C.F.R. §§ 404.1520, 416.920; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000).

If the plaintiff fails to meet the burden of proving the requirements in the first four steps, the

administrative law judge may find that the plaintiff is not disabled.  Burns v. Burnhart, 312 F.3d

at 119.  The Commissioner is charged with the burden of proof with respect to the fifth step in

the evaluation process.  Id.

        In the instant case, the ALJ found: (1) plaintiff has not engaged in substantial gainful

activity since the alleged onset of disability on November 1, 2002; (2) plaintiff suffers from

depression and lumbo-sacral strain, which are severe; (3) these impairments do not meet or

medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) plaintiff

cannot return to any past relevant work; and (5) there were jobs in the national economy that

plaintiff could perform.  (R. at 21-22.)

        Based upon a review of the medical records, the ALJ found that plaintiff's limitations

were primarily physical (R. at 17) and that plaintiff had

>        the residual functional capacity to perform work that does not require:
>        exertion above the light level; or more than occasional climbing,
>        balancing, stooping, kneeling, crouching, or crawling; or more than
>        simple, routine, repetitive tasks, with one- or two-step instructions
>        performed in a low-stress environment, defined as work requiring few
>        decisions; or more than occasional contact with the public or coworkers;
>        or strict production requirements.

(R. at 18.)  The ALJ reviewed the records of Sharon Regional Health System which noted

plaintiff's depression, although those records reflects that plaintiff had a GAF of 58, which

denotes only moderate impairment.[1]  In the decision dated July 15, 2004, the ALJ noted that

although the record had been left open for certain medical records to be provided, the records had

not been provided by the time of the decision which was approximately eight months after the

hearing – clearly in excess of the two weeks the ALJ had provided for the record to remain open.

There were no records from Mercer Behavioral Health or Greenville Behavioral Health.  There

were no records provided for an emergency room visit for depression, although plaintiff had

testified to that type of visit.  (R. at 18.)

        The ALJ concluded that Dr. Uran's conclusion that plaintiff could not deal with work

stress was "contradicted by her own findings during the mental-status examination . . . and by the

[plaintiff's] ability to run a household and to live with her grandson's father, whom she spoke of

disparagingly."  (R. at 19.)  The ALJ also found Dr. Uran's conclusion was contradicted by the

state agency reviewing doctor who found serious mental impairments although not disabling.  (R.

at 19.)  The ALJ concluded that the state agency opinion was "the most thorough of record."  (R.

at 19.)  Also, Dr. Uran's finding relating to work stresses although implicating disability was not

_____

        [1]The GAF Scale assesses an individual's psychological, social and occupational
functioning with a score of 1 being the lowest and a score of 100 being the highest.   A GAF
score of between 50-60 denotes moderate impairment.  The GAF score considers "psychological,
social, and occupational functioning on a hypothetical continuum of mental health-illness."
American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-
IV-TR) 34 (4th ed. 2000); see Lozada v. Barnhart, 331 F.Supp.2d 325, 330 n.2 (E.D. Pa. 2004).
An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty
in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g.,
suicidal ideation . . . .)" or "impairment in social, occupational, or school functioning (e.g., no
friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or
communication" or "major impairment in several areas, such as work or school, family relations,
judgment, thinking or mood; of 30 may have behavior "considerably influenced by delusions or
hallucinations" or "serious impairment in communication or judgment (e.g., . . . suicidal
preoccupation)" or "inability to function in almost all areas . . . ."  (Id.)

supported by objective evidence, was contradicted by the thorough rationale of the state agency

reviewing doctor and also by the plaintiff's activities of daily living.  (R. at 19.)  The records

from Dr. Te and plaintiff's chiropractors noted her lumbosacral strain but they did not support

pain at the disabling level.  (R. at 19.)

     Dr. Poolos, the examining physician, noted unremarkable findings and that plaintiff had

the capacity to perform light work.  (R. at 19.)  Pain and suffering in plaintiff's left hand appear

to be due to an altercation and the ALJ did not find those conditions to have persisted for twelve

consecutive months.  (R. at 19.)  The ALJ noted that plaintiff complained of pain but took no

medication and that the Celexa reduced her crying spells.  He could find no objective medical

evidence to support her reports of dizzy spells.  (R. at 19.)  He found that plaintiff's treatment,

examination and medical records did not show a mental limitation of the severity about which

plaintiff testified.  (R. at 20.)  He found plaintiff's allegations not to be fully credible.  (R. at 20.)

     Plaintiff presents essentially two arguments:  First, plaintiff argues that the ALJ failed to

consider medical evidence including assertions that the ALJ had inadequate reasons for rejecting

Dr. Uran's assessment that plaintiff had poor or no ability to deal with work stresses and failed to

consider Dr. Te's notations on November 13, 2002 that plaintiff was temporarily disabled for one

year.  Plaintiff also referred to findings of Dr. Faust noting a subluxation[2] in plaintiff's spine.

The second major thrust of plaintiff's arguments is that the ALJ erred in failing to find plaintiff's

testimony fully credible including her ability to perform only sporadic household activities.  It is

notable with respect to the evidence submitted after the ALJ's decision – specifically the medical

---

[2]"Subluxation" is defined as "a partial or incomplete dislocation."  Taber's Cyclopedic
Medical Dictionary at 2097 (20th ed. 2005).

evidence relating to the MRI – that plaintiff does not argue for a remand pursuant to section 6 of

42 U.S.C. § 405(g).  With respect to the evidence submitted after the date of the decision, the

court cannot conclude the evidence was reflective of the period for which the ALJ was making

the determination and thus that evidence does not warrant a remand.  See Szubak v. Sec'y of

Health & Human Serv., 745 F.2d 831, 833 (3d Cir. 1984) ("An implicit materiality requirement

is that the new evidence relate to the time period for which benefits were denied, and that it not

concern evidence of a later-acquired disability or of the subsequent deterioration of the

previously non-disabling condition.").

### a. *Weight afforded to medical opinions*

In making disability determinations, an administrative law judge has a duty to consider

the opinions of treating physicians and to give them substantial weight.  "A cardinal principle

guiding disability eligibility determinations is that the ALJ accord treating physicians' reports

great weight, especially 'when their opinions reflect expert judgment based on a continuing

observation of the patient's condition over a prolonged period of time.'"  Morales v. Apfel, 225

F.3d 310, 317 (3d Cir 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)).

Even if a treating physician bases his medical judgment upon a plaintiff's subjective

complaints, the administrative law judge can only reject the treating physician's medical opinion

if there is contradictory medical evidence.  Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir.

1988) (reversing an administrative law judge who rejected the plaintiff's medically credited

symptomatology and instead relied upon his own observations of the plaintiff and the plaintiff's

testimony that he could perform limited household chores).  Essentially, an administrative law

15

judge is required to review all the evidence presented and explain why he rejects probative

conflicting evidence.  See Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

A treating physician's opinion on the issue of whether a claimant is unable to work,

however, does not bind the Commissioner – that decision is solely the responsibility of the

administrative law judge.  20 C.F.R. §§ 404.1527, 416.927(e)(1)-(3).  See Adorno v. Shalala, 40

F.3d 43, 47-48 (3d Cir. 1994) (treating physician's opinion that claimant is disabled or unable to

work is not dispositive).  Also, when a physician's opinion is inconsistent or unsupported by the

record, the administrative law judge may give that opinion less weight.  20 C.F.R. §§ 404.1527,

416.927(d)(3),(4).

An administrative law judge should not accept uncritically a physician's opinion, whether

a physician is a treating physician or an examining physician.  An administrative law judge

instead is required to review all the evidence presented and explain why he rejects probative

conflicting evidence.  In Kent v. Schweiker, 710 F.2d 110, 115 n.5 (3d Cir. 1983), the court

noted:

> While the ALJ is, of course, not bound to accept physicians' conclusions,
> he may not reject them unless he first weighs them against other relevant
> evidence and explains why certain evidence has been accepted and why
> other evidence has been rejected.

The court finds that the ALJ did not err in the weight given to Dr. Uran's assessment that

plaintiff had poor to no ability to work with work stresses.  Notably, Dr. Uran is not a treating

physician and thus the controlling weight standard is not implicated.  The ALJ explained the

basis for the decision on that matter and specifically noted that the other assessments by Dr. Uran

were inconsistent with that conclusion and in particular a GAF rating of 55 was inconsistent

16

because that indicates only moderate symptoms or difficulty functioning.  See supra n.1.  In addition, plaintiff's own statements were inconsistent with the conclusion of Dr. Uran regarding plaintiff's ability to handle work stresses.  Plaintiff's own statements to the ALJ support the ALJ's conclusions, in particular her providing of childcare.

With respect to Dr. Faust's statement regarding plaintiff's subluxation in her spine, the ALJ found that the record supported limitations relating to her spine, but did not support the limitations claimed by plaintiff.  Dr. Faust's opinion was credited in the limitations found by the ALJ.  Dr. Faust's opinion was contained in a letter noting that he had seen plaintiff once and he did not detail his conclusions.  Also Dr. Faust noted plaintiff was seeing a chiropractor had had periods of improvement.  Dr. Faust's letter cannot be read to support plaintiff's claims, especially because it lacks detail and does not reflect longitudinal treatment.  See Claussen v. Chater, 950 F.Supp 1287 (D.N.J. 1996).

The ALJ took into consideration plaintiff's mental and physical limitations with respect to the finding of light work with various limitations including low stress jobs.  Dr. Tarter's assessment was consistent with the ALJ's conclusion.  Dr. Te's assessment of disability is a conclusion which is left to the ALJ and is not given weight.  See Adorno, 80 F.3d at 47-48.  Dr. Te's reports did not detail the basis for the conclusion of disability and Dr. Te's conclusions were contradicted by Dr. Poolos' examination and the assessment completed by Dr. Kar.  Reviewing the record as a whole, the court finds that substantial evidence supports the ALJ's findings with respect to the weight to be afforded to the medical opinions in issue.

17

**b. _Plaintiff's credibility_**

The standard for evaluating a claimant's subjective complaints, including pain, are set forth in the Social Security regulations. See Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999). Once a claimant establishes a medical impairment that could reasonably be expected to produce the pain or other subjective symptoms alleged and which, taken with all other evidence, could lead to a conclusion of disability, the administrative law judge must assess the degree to which the claimant is accurately stating his or her subjective symptoms or the extent to which they are disabling. Id.; see 20 C.F.R.§§ 404.1529, 416.929.  In addition to medical evidence, the following factors may be considered in assessing the credibility of a claimant's statements: (1) daily activities; (2) duration, location, frequency, and intensity of the pain and other symptoms; (3) precipitating and aggravating factors; (4) medication taken to alleviate pain or other symptoms; (5) treatment other than medication; (6) any other measures used to relieve the symptoms; and (7) other factors concerning functional limitations or limitations due to pain or other symptoms. 20 C.F. R. §§ §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii).  The court must defer to the administrative law judge's credibility determinations, unless they are not supported by substantial evidence.  Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981); Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974).

In this case, the ALJ considered the factors noted above and determined that plaintiff was not fully credible.  That finding was based upon plaintiff's daily activities, including her ability to run a household; plaintiff not taking any prescription medication for pain; no objective medical evidence supporting plaintiff's claim of dizzy spells; plaintiff's medication Celexa reducing her

crying spells; and medical evidence not supporting the extent of limitations claimed by plaintiff with regard to her lumbo-sacral strain.  (R. at 19.)  Also, the numbness in plaintiff's hands was supported by medical records, but only an a temporary basis.  (R. at 20.)  The ALJ noted that certain medical records were to be submitted, but that plaintiff failed to submit those records.  Based upon the explanation provided by the ALJ and a review of the record as a whole, there is substantial evidence to support the ALJ's assessment of plaintiff's credibility.

### *Conclusion*

Based upon the evidence of record, the parties' arguments and supporting documents filed in support and opposition thereto, this court concludes that substantial evidence supports the ALJ's finding that the plaintiff is not disabled.  The decision of the ALJ denying plaintiff's application for SSI is affirmed.

Therefore, plaintiff's motion for summary judgment (Docket No. 7) is **DENIED**, and defendant's motion for summary judgment (Docket No. 9) is **GRANTED**.

**IT IS ORDERED AND ADJUDGED** that judgment is entered in favor of defendant, Jo Anne B. Barnhart, Commissioner of Social Security, and against plaintiff, Rosemarie Kaiser.

The clerk shall mark this case as closed.

By the court:

/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

Dated:   March 31, 2006

cc:      Counsel of Record